**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION**

| | | |
|---|---|---|
| CHRISTY MICHELLE MCBRIDE, | § | |
| | § | |
| Plaintiff, | § | CIVIL ACTION NO. 4:22-CV-00290- |
| v. | § | ALM-AGD |
| | § | |
| COMMISSIONER, SSA, | § | |
| | § | |
| Defendant. | § | |

**REPORT AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE**

Plaintiff brings this appeal for judicial review of the final decision of the Commissioner of Social Security ("Commissioner") pursuant to 42 U.S.C. § 405(g), denying her claim for a period of disability and disability insurance benefits. After reviewing the Complaint (Dkt. #1), Answer (Dkt. #6), and Briefs submitted by the Parties (Dkt. #10, #11, #12), as well as the evidence contained in the administrative record, the court recommends that the Commissioner's decision be **AFFIRMED**.

**BACKGROUND**

**I.    PROCEDURAL HISTORY OF THE CASE**

On August 14, 2019, Plaintiff filed an application for a period of disability and disability insurance benefits under Title II ("Title II") of the Social Security Act (TR 34, 204–10). Plaintiff alleges an onset of disability date of August 1, 2019 (TR 36, 204, 231). On January 21, 2020, the claim was initially denied (TR 96–107), and upon reconsideration on June 18, 2020 (TR 109–24), Plaintiff's application was again denied. Plaintiff requested an administrative hearing ("Hearing") (TR 55–95), which was held before an Administrative Law Judge ("ALJ") on February 25, 2021. At the Hearing, the ALJ heard testimony from Plaintiff, Plaintiff's attorney representative, and a

vocational expert ("VE") (TR 55–95). On March 30, 2021, the ALJ issued an unfavorable decision denying Plaintiff's application (TR 31–54). On May 4, 2021, Plaintiff requested review of the ALJ's decision by the Appeals Council (TR 201–203).[1] On May 20, 2021, the Appeals Council granted Plaintiff's request for more time before it acted on the case (TR 28–29). On June 9, 2021, Ms. Landers, Plaintiff's then-counsel, requested a second extension of time due to the hardships of COVID-19 (TR 27), which the Appeals Council granted on July 21, 2021 (TR 25–26). The Appeals Council denied Plaintiff's request on October 6, 2021, making the decision of the ALJ the final decision of the Commissioner (TR 12–17). On April 6, 2022, Plaintiff filed the instant lawsuit (Dkt. #1). On June 16, 2022, the Administrative Record was received from the Social Security Administration (Dkt. #7). Plaintiff filed her Opening Brief on July 17, 2022 (Dkt. #10), the Commissioner filed its Brief in Support of the Commissioner's Decision on September 15, 2022 (Dkt. #11), and Plaintiff filed her Reply Brief on September 23, 2022 (Dkt. #12).

## II.    STATEMENT OF RELEVANT FACTS

### 1.    *Age, Education, and Work Experience*

Plaintiff was born on November 25, 1974, making her forty-four (44) years of age at the time of alleged onset of disability (TR 204; Dkt. #10 at p. 3). Plaintiff's age classification at all relevant times was that of a "younger person." *See* 20 C.F.R. § 404.1563(c). Plaintiff completed high school in 1993 and received a Certified Nurse's Aide ("CNA") license in 2010 (TR 236) and has past work experience as a certified nurse's aide, a housekeeper, and a teacher's aide (TR 91). Plaintiff has not engaged in substantial gainful activity since August 1, 2019, the alleged date of onset of disability (TR 36).

---

[1] It appears that Plaintiff's counsel at the time, Lynda Landers, requested more time, but the Transcript does not include such a request.

## 2. *Relevant Medical Records*

The ALJ found Plaintiff has the severe impairments of degenerative disc disease of the lumbar spine status post lumbar spine fusion surgery; degenerative disc disease of the cervical spine; and right carpal tunnel syndrome (TR 36). Relevant to these conditions and the arguments raised by Plaintiff are the medical opinions and evaluations from providers including, but not limited to, Dr. Vuhdi V. Slabisak, M.D. ("Dr. Slabisak"), Dr. Michael Middlebrooks , D.P.T. ("Dr. Middlebrooks"), and Dr. Devanshi Gupta, M.D., F.A.A.N., F.A.A.N.E.M. ("Dr. Gupta"), as well as State Agency Medical Consultants Dr. Jeanine Kwun, M.D. ("Dr. Kwum") and Dr. Leigh McCary, M.D. ("Dr. McCary") (together "SAMCs"), as summarized below.[2]

### a. Treating Physical Therapist: Dr. Middlebrooks

On August 8, 2019, Dr. Slabisak prescribed a physical therapy evaluation for Plaintiff, and on August 14, 2019, Plaintiff was evaluated by Dr. Middlebrooks (TR 396, 397–99). During this evaluation, Dr. Middlebrooks' ultimate diagnosis was: (1) other intervertebral disc degeneration, lumbosacral region; (2) low back pain; (3) weakness; and (4) difficulty walking, not elsewhere classified (TR 397). Plaintiff reported to Dr. Middlebrooks that she had: (1) "Difficulty finding a comfortable sleeping position"; (2): "Difficulty walking"; (3) "Loss of function"; (4) "Loss of motion – pain"; (5) "Loss of motion – stiffness"; and (6) "Weakness" (TR 397). Dr. Middlebrooks reports that Plaintiff is unable to work and her "Oswestry Low Back Disability Index Score [is] 68% - Severe Impairment" (TR 397). Plaintiff reported to Dr. Middlebrooks that her pain is typically at an 8, drops to a 4 at its best, and reaches 10 at its worst (TR 398).

---

[2] Other doctors found in the transcript include: Dr. Spencer Shanley, M.D., Dr. Abraham Armani, M.D., Dr. Yoo Joo Hwang, D.O., Dr. Theresa Marie Olfson, E.D., Dr. Karen Seaberg, M.D., Dr. Steve J Hong, Dr. John Roland, Dr. Almas Syed, Dr. Jan Wheat, M.D. Reports from each of these medical professionals were also evaluated by the ALJ (TR 310–574).

Plaintiff visited Dr. Middlebrooks again on August 16, 2019 (TR 400–02). Plaintiff reported being a little more sore after the physical therapy session than she had two days prior (TR 400). Plaintiff and Dr. Middlebrooks discussed exercises and activities she could do to help her situation (TR 401). Dr. Middlebrooks' ultimate assessment from this visit was:

> The patient appears motivated and is able to perform exercises correctly with difficulty due to pain. The patient's progress towards goals is poor and her tolerance to treatment is fair. Patient . . . consents to treatment plan and goals and gives verbal informed consent. P[atien]t tolerated manual therapy fair with moderate TTP along lumbar paraspinals. P[atien]t unable to progress ther [*sic*] ex due to low back pain.

(TR 401). Dr. Middlebrooks wrote several goals for Plaintiff to achieve in the following four to six weeks (TR 401).

Plaintiff attended a third visit with Dr. Middlebrooks on August 21, 2019 where the report was relatively unchanged (TR 403–05); a fourth physical therapy visit on August 23, 2019, where Plaintiff reported a slight improvement in back pain that lasted for about a day after a previous visit (TR 406–08); a fifth visit on August 26, 2019, with similar results as the previous visit including decreased symptoms, but Dr. Middlebrooks noted Plaintiffs tolerance toward treatment had become poor (TR 409–11); and a sixth and final visit on August 27, 2019, with similar results as the previous visits, but a recommended follow-up with Dr. Gupta based on poor tolerance for treatment (TR 412–14).

### b.  Treating Physician: Dr. Gupta, Neurologist[3]

Plaintiff was treated by several doctors to assess the extent of her pain and functional levels. One treating physician contained in the record is Dr. Gupta, whose treatment record runs from December 8, 2020 to December 29, 2020 (TR 521–25). The record from Plaintiff's initial consultation on December 28, 2020, observes: "There is electrophysiologic evidence of: 1. C5

---

[3] The office treatment records of Dr. Gupta were submitted to the ALJ by Plaintiff after the hearing.

radiculopathy with secondary azonal loss, MRI correlation is recommended[;] 2 L5, S1 radiculopathy, MRI correlation is recommended[; and] (3) Mid Carpal Tunnel Syndrome right side" (TR 522). Dr. Gupta also assessed: "intractable migraine without aura and with status migrainosus[ and] Intractable drug-induced headache, not elsewhere classified (TR 524). Dr. Gupta recommended an MRI and a four-week, follow-up visit (TR 524).[4] Dr. Gupta notes that the reason for the visit was Plaintiff having "the worst headache of her life followed by constant continuous headache[s]" (TR 524). The initiating headache was described as a 10 out of 10 on a pain scale, and the recurring headaches as a 5 out of 10 (TR 523). Dr. Gupta's examination, aside from abnormalities for which an MRI was recommended, noted that Plaintiff was a "[w]ell developed person in no acute distress," she was "[a]wake and alert," she was "[o]riented to time, place, person," her "[b]ulk and tone are normal," her "[s]trength is 5/5 in all 4 extremities," and her "Romberg's and Tandem Gait are normal" (TR 523–24). Due to the intractable migraine without aura and with status migrainosus, Dr. Gupta prescribed "Topiramate Tablet, 50 MG, 1 tablet Orally, Twice a day, 30 day(s), 60 Tablet, Refills 1[;] IMAGING: MRA Head/Brain W / WO[; and] IMAGING: MRI Head/Brain W / WO" (TR 524). Dr. Gupta's notes state: "She would greatly benefit from reducing current pain medication and muscle relaxants but at this time it seems impossible. Patient is highly motivated to consider this if better" (TR 524).

### c.  Treating Surgeon: Dr. Slabisak

Plaintiff has been seeing Dr. Slabisak for over ten years (TR 46). On February 17, 2021, Dr. Slabisak completed a Residual Functional Capacity Questionnaire for Plaintiff (TR 477–81). Dr. Slabisak noted limited cervical range of motion and lumbar range of motion (TR 477). The report indicates Plaintiff got headaches that would last an hour about once or twice a week "until

---

[4] The record does not include any evidence of a follow-up visit or MRI results per Dr. Gupta's recommendation.

neurologist recently prescribed medication" which provided Plaintiff "with some relief" (TR 478). The report, without any explanation or elaboration, quantified Plaintiff's limitations regarding activities such as walking, sitting, twisting, bending, squatting, and climbing (TR 479–81). Dr. Slabisak wrote that Plaintiff is "incapable of even 'low stress' jobs due to pain" (TR 479).

### d. State Medical Agency Consultants: Dr. Kwun and Dr. McCary

At the initial level, Dr. Kwun completed Plaintiff's disability determination that found severe impairment for disorders of back-discogenic and degenerative as well as spine disorders (TR 102). Dr. Kwun considered Plaintiff's activities of daily living, medical treatment, non-medical treatments, and Plaintiff's statements (TR 102). Dr. Kwun found that Plaintiff's statements about her medical condition were only "partially supported" by the record (TR 102). As to her RFC, Dr. Kwun found Plaintiff has exertional limitations for: lifting/carrying occasionally of 20 pounds, and frequently for 10 pounds; standing and walking with normal breaks about 6 hours in an 8-hour workday; and sitting for about 6 hours in an 8-hour workday with normal breaks; and unlimited pushing or pulling including operation of hands and feet (TR 103). Plaintiff's postural limitations are: occasional climbing of ramps/stairs, balancing, stooping/bending, kneeling, crouching, and crawling; and never climbing ladders/ropes/scaffolds (TR 103). No manipulative, visual, communicative, or environmental limitations were found (TR 104). Dr. Kwun did not make a finding about Plaintiff's past relevant work "because all potentially applicable Medical-Vocational Guidelines would direct a finding of 'not disabled' given the individual's age, education and RFT. Therefore, the individual can adjust to other work" (TR 105). Dr. Kwun determined that Plaintiff "demonstrates the maximum sustained work capability for the following: LIGHT," concluding that Plaintiff is not disabled (TR 105).

On reconsideration, Dr. McCary considered Plaintiff's alleged changes to her medical condition; specifically, Plaintiff complains of "constant muscle pain in [her] back" and that she "cannot sit, stand, or lay down or cross [her] legs without hurting especially during cold weather" (TR 110). Dr. McCary's assessment is for the period of time between March 14, 2019 and November 2, 2019 (TR 120). Dr. McCary found Plaintiff has severe disorders of back-discogenic and degenerative as well as inflammatory arthritis (TR 116). As with Dr. Kwun, Dr. McCary found that "the alleged functional limitations are partially consistent w/ the objective medical evidence" (TR 120). Dr. McCary reached nearly the same conclusion as at the initial level, except for lowering Plaintiff's ability to occasionally lift/carry 20 pounds to 10 pounds (TR 120). Dr. McCary ultimately found that Plaintiff has a sustained work capacity of "LIGHT," and she is not disabled (TR 123).

### 3. *Hearing Testimony*

#### a. **Plaintiff's Testimony**

On February 25, 2021, the ALJ held a telephonic Hearing (TR 55–95).[5] During the Hearing, the ALJ and Plaintiff's attorney representative questioned Plaintiff. Plaintiff answered questions from the ALJ regarding her background, her symptoms, her treatments, her limitations engaging in daily life activities, and her duties during past work experiences (TR 62–76). The ALJ asked Plaintiff to explain her current abilities to walk, stand, sit, carry/lift weight, etc. (TR 72–76). Plaintiff testified that she could walk less than a block at a time, stand for ten minutes at a time, sit for ten to fifteen minutes at a time, and lift or carry no more than ten pounds occasionally (TR 72–

---

[5] ALJ:   Due to the extraordinary circumstances presented by the Coronavirus pandemic, I am conducting this hearing over the phone. . . . The testimony today is solely your own. It will be taken under oath. No one can help you, including via text or any other personal or private communications during the hearing.
(TR 57).

73). Plaintiff also testified that she can do activities of daily living such as bathing, grooming, cooking, and chores, all of which she says she can do, but at a slower pace (TR 74–76).

Plaintiff was then questioned by her attorney representative (TR 76–90). Plaintiff's attorney asked about Plaintiff's surgery in November 2019, and Plaintiff testified that her ability was worse after the surgery because of the pain (TR 76). Plaintiff additionally testified about the medications she takes and their effect on her, claiming they make her really drowsy (TR 77–78). She also testified that she has poor sleeping habits due to the pain in her back (TR 78–80). Plaintiff stated that she takes her medication when she wakes in the morning and shortly thereafter has to lie down due to the drowsiness (TR 80–82). Then, Plaintiff testified about numbness in her feet if she sits too long, pain in her neck, headaches, and dizziness (TR 82–87). Plaintiff discussed that Dr. Gupta spotted some nerve damage possibly in Plaintiff's C5 and C6 (TR 87). Plaintiff's attorney asked about her interactions with family, and Plaintiff said she sometimes cares for her grandson who lives in the house with her, but that family does not visit often because she is grumpy due to the pain (TR 89–90).

### b. VE's Testimony

The VE testified about Plaintiff's past employment history, noting two occupations classified as light work and one as medium work (TR 91). The ALJ posed three hypotheticals to the VE and asked whether a person with such limitations in the hypotheticals could perform Plaintiff's past relevant work (TR 91–93). Plaintiff's attorney representative did not question the VE (TR 93). The VE first classified Plaintiff's past work as follows:

Q:   Mr. Bowden [VE], would you please classify the past work?

A:   Certainly. She's worked a certified nurse's aide, and that is 355.674-014, SVP: 4, semi-skilled, medium. She's worked as a housekeeper, 323.687-014, SVP: 2, unskilled, light. And she's worked as a teacher's aide, and this is 249.367-074, SVP: 3, semi-skilled, light. And this is her past work.

(TR 91). The ALJ then posed hypothetical limitations to the VE, asking which past work a person could perform with the various limitations proposed. The hypotheticals were as follows:

Q:    All right. Thank you. I'm going to ask you to assume a hypothetical individual the Claimant's age and education with the past work that you described. Further, assume this individual could perform work at the sedentary exertional level as defined in the regulations with the following. Can occasionally climb ramps and stairs. No climbing ladders, ropes, or scaffolds. Can perform occasional stooping, kneeling, crouching, crawling. And no work at unprotected heights. We'll just start with that hypothetical. Under hypothetical number one could this individual perform the past work that you described?

A:    No, Your Honor. The past work all required her to be on her feet six hours or more a day. And under this hypothetical her past work would be precluded.

Q:    Ok. Is there other work in the national economy that can be performed under hypothetical number one?

A:    Yes, Your Honor. She is by definition a younger person, 46. So we can look at unskilled sedentary jobs and I'll give you some examples.

Q:    Okay.

A:    A telephone clerk, 209.667-014, SVP: 2, unskilled, sedentary, about 240,000 in the national economy. A second example would be an order clerk, 209.567-014, SVP: 2, unskilled, sedentary, about 122,000 in the national economy. And a third example would be an address clerk—A-D-D-R-E-S-S—209.587-010, SVP: 2, unskilled, sedentary, about 112,000 in the national economy.

Q:    Okay.

A:    That's three examples.

Q:    Thank you. For hypothetical number two, if I did add—I want to keep the same exertional and the limitations presented. But if I did add a sit-stand option where they could sit for—or—yeah. Sit for ten minutes then briefly stand up to ten minutes before resuming work at the workstation. But during this time that they are standing they're actually laying down. So, [t]hey're sitting ten minutes, go to lay down ten minutes, come back to the workstation. Under hypothetical number two, would your testimony change?

A:    So, you're saying that when she has to get up from sitting she has to lie down?

Q:      Right.

A:      That would preclude full-time competitive employment, Your Honor.

Q:      Okay. And if we go back to hypothetical number one, under hypothetical number three if I keep the same limitations—because it is one in exertional level—but if I do add that due to pain and the individual is not going to be able to complete tasks without needing time to rest, and if I put that in terms of needing at least two additional unscheduled breaks of 15 minutes' duration each on a regular basis, would there be any change to your testimony that you gave us?

A:      Yes, Your Honor. That would represent too much time off task if she has to take two additional breaks of 15 minutes each and would preclude being able to perform the jobs I testified to.

Q:      Okay. Has your testimony been consistent with the information found in the Dictionary of Occupational Titles?

A:      It has been.

Q:      Okay. Thank you. Ms. Landers [Plaintiff's attorney], do you have any questions?

A:      [By Ms. Landers] No, ma'am, Your Honor. You asked great vocational questions—

Q:      Okay.

(TR 91–93).

## III.    FINDINGS OF THE ALJ

### 1.  *Sequential Evaluation Process*

Pursuant to the statutory provisions governing disability determinations, the Commissioner has promulgated regulations that establish a five-step process to determine whether a claimant suffers from a disability. 20 C.F.R. § 404.1520. First, a claimant who is engaged in substantial gainful employment at the time of her disability claim is not disabled. *Id.* § 404.1520(b). Second, the claimant is not disabled if her alleged impairment is not severe, without consideration of her residual functional capacity, age, education, or work experience. *Id.* § 404.1520(c). Third, if the alleged impairment is severe, the claimant is considered disabled if her impairment corresponds to

a listed impairment in 20 C.F.R., Part 404, Subpart P, Appendix 1. *Id.* § 404.1520(d). Fourth, a claimant with a severe impairment that does not correspond to a listed impairment is not considered to be disabled if she can perform her past work based on her residual functional capacity. *Id.* § 404.1520(e). Finally, a claimant who cannot return to her past work is not disabled if she has the residual functional capacity to engage in work available in the national economy. *Id.* § 404.1520(f). Under the first four steps of the analysis, the burden lies with the claimant to prove disability, and at the last step, the burden shifts to the Commissioner. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995). If at any step the Commissioner finds that the claimant is or is not disabled, the inquiry terminates. *Id.*

### 2. *ALJ's Disability Determination*

After hearing testimony and conducting a review of the facts of Plaintiff's case, the ALJ made the following sequential evaluation (TR 31–54). At step one, the ALJ found Plaintiff had not engaged in substantial gainful activity since August 1, 2019, the date of alleged onset (TR 36). At step two, the ALJ found Plaintiff has severe impairments for degenerative disc disease of the lumbar spine status post lumbar spine fusion surgery; degenerative disk disease of the cervical spine; and right carpal tunnel syndrome (TR 36). At step three, the ALJ found Plaintiff did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526) (TR 41). At step four, the ALJ determined Plaintiff has the following residual functional capacity ("RFC"):

> [T]he claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a). That is the claimant can lift and carry 10 pounds occasionally and less than 10 pounds frequently, as well as stand/walk 2-hours out of an 8-hour workday and sit 6-hours out of an 8-hour workday. However, the claimant can occasionally climb ramps and stairs and never climb ladders,

ropes, or scaffolds. She can perform occasional stooping, kneeling, crouch[ing], and crawling. She may not work at unprotected heights.

(TR 42). Continuing the step four analysis, the ALJ determined that Plaintiff is incapable of performing past relevant work, specifically:

> The vocational expert testified that an individual with the claimant's age, education, work experience, and residual functional capacity could not perform the claimant's past work (Hearing Testimony). Therefore, in comparing the claimant's residual functional capacity with the physical and mental demands of this work, the undersigned finds that the claimant is unable to perform this past relevant work as generally and actually performed. The demands of the claimant's past relevant work exceed the residual functional capacity.

(TR 47). Accordingly, the ALJ moved to the fifth inquiry in the sequential analysis.

The ALJ determined that, considering Plaintiff's age, education, work experience, and RFC, there are jobs that Plaintiff can perform in the national economy that exist in significant enough numbers (TR 47–48). The ALJ considered the Plaintiff's individual qualifications in conjunction with the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2 (TR 48). The ALJ noted that "Medical-Vocational Rule 201.21 would direct a finding of 'not disabled,'" but that Plaintiff has "additional limitations" (TR 48). Accordingly, the ALJ questioned the VE about available jobs for a worker with Plaintiff's age, education, work experience, RFC, and additional limitations, and the VE informed the ALJ of three examples—telephone clerk, order clerk, and address clerk (TR 48, 91–93). Therefore,

> Based on the testimony of the vocational expert, the undersigned concludes that, considering the claimant's age, education, work experience, and residual functional capacity, the claimant is capable of making a successful adjustment to other work that exists in significant numbers in the national economy. A finding of "not disabled" is therefore appropriate under the framework of [SSR 00-4p].

(TR 48).

Based on this determination, the ALJ concluded Plaintiff was not disabled from August 1, 2019, through the date of the ALJ's decision, March 30, 2021 (TR 48–49).

## STANDARD OF REVIEW

On an appeal under § 405(g), a court "reviews a Commissioner's denial of social security disability benefits 'only to ascertain whether (1) the final decision is supported by substantial evidence and (2) whether the Commissioner used the proper legal standards to evaluate the evidence." *Webster v. Kijakazi*, No. 20-60856, 2021 WL 5563333, at *1 (5th Cir. Nov. 29, 2021) (quoting *Keel v. Saul*, 986 F.3d 551, 555 (5th Cir. 2021) (quotation marks and citation omitted)); *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994), *cert denied*, 514 U.S. 1120 (1995); 42 U.S.C. § 405(g). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Cook v. Heckler*, 750 F.2d 391, 392 (5th Cir. 1985); *Jones v. Heckler*, 702 F.2d 616, 620 (5th Cir. 1983). Substantial evidence "need not be a preponderance." *Webster*, 2021 WL 5563333, at *1 (quoting *Taylor v. Astrue*, 706 F.3d 600, 602 (5th Cir. 2012)). Conflicts in the evidence are resolved by the ALJ; the court cannot reweigh the evidence or substitute its judgment for that of the Commissioner, though it will scrutinize the record to determine if evidence is present. *Harris v. Apfel*, 209 F.3d 413, 417 (5th Cir. 2000); *Bowling v. Shalala*, 36 F.3d 431, 434 (5th Cir. 1995); *Carry v. Heckler*, 750 F.2d 479, 484 (5th Cir. 1985).

The legal standard for determining disability under the Act is whether the claimant is unable to perform substantial gainful activity for at least twelve months because of a medically determinable impairment. 42 U.S.C. §§ 423(d), 1382c(a)(3)(A); *see Cook*, 750 F.2d at 393. "Substantial gainful activity" is determined by a five-step sequential evaluation process. 20 C.F.R. § 404.1520(a)(4).

## ANALYSIS

Plaintiff appeals the ALJ's Decision through two separate issues, which can be broken down into seven sub-issues (Dkt. #10 at pp. 1–2). The first issue Plaintiff raises is whether the ALJ failed to properly evaluate all of Plaintiff's severe impairments in determining Plaintiff's RFC: (i) the ALJ did not consider Plaintiff's severe impairment of right carpal tunnel syndrome; and (ii) the ALJ did not find a severe impairment of headaches (Dkt. #10 at p.1). The second issue Plaintiff raises is whether the ALJ did not properly consider the medical opinions in the record and improperly substituted her own medical opinions: (iii) the ALJ rejected the medical opinions of the SAMCs; (iv) the ALJ rejected the medical opinion of Dr. Slabisak; (v) the ALJ's opinion is not consistent with the medical evidence in the record; (vi) the ALJ did not refer to any non-medical evidence to support her decision; and (vii) the ALJ did not consider limitations regarding bilateral reaching (Dkt. #10 at pp.1–2).

### 1. *The ALJ Properly Evaluated Plaintiff's Severe Impairments in the RFC*

The RFC is an assessment based on all the relevant evidence of a claimant's maximum ability to do work on a sustained basis in an ordinary work setting despite his or her impairments.[6] 20 C.F.R. § 404.1545(a); *see Myers v. Apfel*, 238 F.3d 617, 620 (5th Cir. 2001). The RFC is the most a claimant is able to do despite her physical limitations. The ALJ "is responsible for assessing the medical evidence and determining the claimant's residual functional capacity." *Perez v. Heckler*, 777 F.2d 298, 302 (5th Cir. 1985). The ALJ is not required to incorporate limitations in the RFC she finds unsupported by the record. *See Muse v. Sullivan*, 925 F.2d 785, 790 (5th Cir. 1991); *Kozlowski v. Colvin*, No. 4:13-cv-020-A, 2014 WL 948653, at *7 (N.D. Tex. Mar. 11,

---

[6] When considering a claimant's RFC, the Commissioner assesses an applicant's physical, mental, and sensory abilities, evaluates how those abilities apply to that applicant's work-related functioning, and finally considers whether that applicant can sustain work-related activities in a work setting on a regular and continuing basis. *See* 20 C.F.R. § 404.1545(b)–(d); S.S.R. 96-8p, 1996 WL 374184 at *3–4.

2014). "The inquiry for the Court is whether the record as a whole 'yields such evidence as would allow a reasonable mind to accept the conclusions reached by the ALJ.'" *Loza v. Apfel*, 219 F.3d 378, 393 (5th Cir. 2000); *see Perez v. Barnhart*, 416 F.3d 457, 461 (5th Cir. 2005); *Jones v. Saul*, No. 4:20-CV-00772-BP, 2021 WL 2895867, at *4–5 (N.D. Tex. July 9, 2021) (finding no error where the ALJ determined that [the treating physician's] opinion was inconsistent with the record as to the limitations he expressed). The ALJ's RFC decision can be supported by substantial evidence even if she does not specifically articulate all the evidence that supports her decision, or all the evidence that she rejected. *See Falco v. Shalala*, 27 F.3d 160, 163–64 (5th Cir. 1994) ("The ALJ is bound by the rules of this Court to explain his reasons for rejecting a claimant's complaints of pain. He did so. That he did not follow formalistic rules in his articulation compromises no aspect of fairness or accuracy that this process is designed to ensure."). The court addresses the two sub-issues of Plaintiff's first issues separately below as one concerns the ALJ's consideration of a severe impairment, and the other concerns the ALJ's consideration of a non-severe impairment.

### a. The ALJ Properly Considered Plaintiff's Right Carpal Tunnel Syndrome

Plaintiff claims the ALJ erred by not incorporating her severe carpal tunnel syndrome as a limitation when determining her RFC (Dkt. #10 at p. 1). This court is not positioned to review Plaintiff's case *de novo*, but rather to determine if the ALJ made her decision based on evidence such that "a reasonable mind [would] accept the conclusions reached by the ALJ." *Loza*, 291 F.3d at 393. In determining Plaintiff's RFC, the ALJ stated that Plaintiff's "right carpal tunnel syndrome, mild, [is] more than a slight abnormality and cause[s] more than minimal functional limitations" (TR 41). Going into greater detail to point out the disconnect between the objective and subjective evidence in the record, the ALJ found as follows:

Turning to the medical evidence, the objective findings in this case fail to provide strong support for the full extent of the claimant's allegations of disabling symptoms and limitations. There is a lack of imaging studies or diagnostic studies to suggest greater limitations (see e.g., Exhibits 6F/2-3; 8F/18-20; 15F/2). The exam findings indicate relatively intact functioning that would not be expected of someone who was more limited. She has usually had normal coordination and gait and normal muscle strength, bulk, and tone (see e.g., Exhibits 6F/7; 8F/8-9, 13, 16-17, 22, 27; 12F/8; 14/F10; 15F/3-4; 16F/10, 13, 16). The absence of significant musculoskeletal or neurological findings is not suggestive of the claimant being substantially limited. Despite the claimant's allegations of significant pain, she was generally assessed to be in no distress (see e.g., Exhibits 15F/3-4; 16F/10, 13, 18). This is not consistent with her allegations, as one would expect consistent outward signs of pain if she were experiencing the level of pain alleged.

. . . Indeed, while a follow-up EMG revealed lumbar and cervical radiculopathy, and mild right carpal tunnel (Exhibit 15F/2), the exam noted the claimant exhibited 5/5 strength in all extremities with intact sensory, and a normal gait (Exhibit 15F/3-4). In April 2020, her medications were adjusted with the reduction of pain medications to once a day and the addition of a muscle relaxer (see Exhibit 12F/26), and subsequent exams noted the claimant was in no acute distress, well-groomed, alert and fully oriented with intact deep tendon reflexes in the bilateral upper and lower extremities (see Exhibits 14F/10, 17; 16F/10, 13, 18).

Taken as a whole, the general lack of significant muscloskeletal and neurological abnormalities, the imaging studies showing relatively minor positive findings, the observations of the claimant generally not being in distress, and the claimant's relatively conservative and minimal treatment post-fusion surgery in November 2019 are inconsistent with the claimant's allegations. For these reasons, especially considering her usually normal coordination and gait as well as notations of stable conditions, but also considering her . . . right carpal tunnel syndrome, but also considering an EMG noted the carpal tunnel syndrome as mild and exams have continually noted 5/5 strength in the bilateral upper extremities, including 5/5 grip strength (see Exhibits 6F/7; 8F/8-9, 13, 22, 27; 15F/3-4), and the effect it can have on musculoskeletal functioning, the claimant is limited to, but can perform work at the sedentary exertional level, except occasionally climb ramps, and stairs and occasionally stoop, kneel, crouch, and crawl. [And considering claimant's testimony regarding dizziness and evidence of mild right carpal tunnel syndrome], the claimant can never climb ladders, ropes, and scaffolds or work at unprotected heights.

(TR 44–45).

Based on the ALJ's thorough description of Plaintiff's medical and non-medical evidence, this court finds that the ALJ's decision is based on sufficient evidence to allow reasonable minds to reach the same conclusion.

### b. The ALJ Properly Considered Plaintiff's Non-Severe Headaches

Plaintiff claims the ALJ erred by not incorporating her headaches as limitations into the RFC (Dkt. #10 at p. 1). Plaintiff, contradicted by her own evidence, argues that the ALJ erred because she did not find Plaintiff's headaches to be severe based on SSR 19-4p (Dkt. #10 at pp. 4–5). To support this conclusion, Plaintiff avers that "the Ruling does not preclude a finding of headaches, resulting from another medical condition," as being a severe impairment (Dkt. #10 at pp. 4–5). Yet Ruling 19-4p states, "Primary headaches occur independently and *are not caused by another medical condition*" (Dkt. #10, Exhibit 1 at p. 4) (emphasis added). Plaintiff also contends that Dr. Gupta and Dr. Slabisak both were of the medical opinion that Plaintiff's headaches are "associated with" her severe spinal and cervical impairments (Dkt. #10 at pp. 5–6). Thus, because Plaintiff's doctors *believe* her headaches are caused by her other severe impairments, Plaintiff believes the ALJ should have found her headaches to be severe.[7] Yet Ruling 19-4p states, "We will not use a person's statement of symptoms, a diagnosis, *or a medical opinion* to establish the existence of an MDI(s)" (Dkt. 10, Exhibit 1 at p. 3) (emphasis added). Plaintiff also argues: "Even though the Plaintiff may not have established a 'primary headache disorder,' Social Security Ruling 19-4p does not preclude 'secondary headache disorder.'" Yet Ruling 19-4p states, "We may establish *only* a primary headache disorder as an MDI" (Dkt. #10, Exhibit 1 at p. 8) (emphasis added). As such, Plaintiff's reliance on Ruling 19-4p to support the assertion that the ALJ should have considered Plaintiff's headaches caused as a symptom of her other severe impairments in evaluating her RFC is misplaced.

---

[7] The record does not reflect that Plaintiff was diagnosed with primary headache disorder. Even if Plaintiff had been diagnosed with primary headache disorder, Ruling 19-4p states, "physicians diagnose a primary headache disorder only after excluding alternative medical and psychiatric causes of a person's symptoms." (Dkt. #10, Exhibit 1 at p. 5).

Regardless, the ALJ's Decision assessed the objective evidence of Plaintiff's headaches in the record as follows:

> . . . The claimant saw Devanshi Gupta, M.D., on December 29, 2020, for acute onset of severe pain in the upper back of the neck that radiated into the top of the head, with a pain level of 10 out of 10. An aura did not precede the headache, the headache tended to remain on the top of the head and the back of the head. Headaches sometimes felt more intense on the right side. . . . Dr. Gupta assessed a diagnosis of intractable migraine without aura. He started claimant on Topiramate tablets, 50 mg. (Exhibit 15F). . . .
>
> The claimant presented to TMC Bonham Hospital on February 14, 2021 after experiencing a fainting spell. The claimant also complained of a headache. She rated her pain 6 out of 10 on a pain scale of 0 to 10. The doctor started the claimant on IV fluids. The claimant did not want to wait to finish the IV fluids. Her headache had improved after Toradol and Reglan. The claimant ambulated and was steady on her feet. The claimant's husband was at her side. The claimant was instructed to continue Toradol and Reglan (Exhibit 14F/8-17).
>
> . . .
>
> After careful consideration of the record, the undersigned finds that any other condition[, aside from degenerative disk disease of the lumbar spine status post lumbar spine fusion surgery in November 2019, with failed back syndrome; degenerative disc disease of the cervical spine, and right carpal tunnel syndrome, mild,] did not interfere with the claimant's ability to work and, therefore, [are] not "severe.". . . Migraine headaches were evaluated in accordance with Social Security Ruling (SSR) 19-4p. Claimant reported headaches. The claimant has only been treated one time for a migraine headache at the emergency room, and her symptoms were relieved with medications. The claimant did not have an aura (Exhibit 15F/3). Migraine headaches without aura must satisfy the following criteria: lasting 4 to 72 hours; include at least two of the following characteristics: unilateral location, pulsating quality, moderated to severe pain intensity, and aggravation by or causing avoidance of routine physical activity; and, during a headache, an individual must experience nausea, vomiting, or photophobia and phonophobia (SSR 19-4p). In order to be determined as an MDI, an acceptable medical source has to diagnose a headache disorder or observe a typical headache event. The undersigned finds the claimant's migraine headaches nonsevere. . . .
>
> Because these impairments have been successfully managed or do not seem to limit functionality, they have no more than a minimal limiting effect on the claimant's ability to perform basic work activity and are therefore nonsevere.
>
> The undersigned considered all of the claimant's medically determinable impairments, including those that are nonsevere, when assessing claimant's residual functional capacity.

(TR 40–41). Accordingly, the ALJ considered Plaintiff's medical and non-medical evidence in the record and, contrary to Plaintiff's assertion, incorporated Plaintiff's headaches into her

determination about Plaintiff's RFC. As such, the ALJ properly considered the objective medical evidence and the persuasiveness of the medical opinions, and substantial evidence supports the ALJ's RFC determination. *See Martinez v. Saul*, No. SA-20-CV-00869-ESC, 2021 WL 2253912, at *5-6 (W.D. Tex. June 3, 2021) (finding substantial evidence for the RFC where the ALJ considered all objective medical evidence in the record). Worth noting, the ALJ "does not have 'to state the weight given to each symptom and diagnosis in the administrative record.'" *Mary C. R. v. Kijakazi*, No. 3:20-CV-00286-BT, 2021 WL 4476764, at *3 (N.D. Tex. Sept. 30, 2021) (quoting *Michelle K. M. v. Berryhill*, 2019 WL 1243355, at *13 (N.D. Tex. Mar. 18, 2019)). And failure to "mention a particular piece of evidence does not necessarily mean that [the ALJ] failed to consider it" when the ALJ "states explicitly that [she] considered the entire record" in the decision. *Id.* (quoting *Hammond v. Barnhart*, 124 F. App'x 847, 851 (5th Cir. 2005)).

### 2.  *ALJ Properly Considered Medical and Non-Medical Evidence*

Taking Plaintiff's remaining five sub-issues together, as described by Plaintiff, the issue is whether "the ALJ properly considered all the medical opinions of record and properly substituted her own medical opinion to determine Plaintiff's RFC" (Dkt. 10 at p. 2).[8]

To the extent Plaintiff claims "the ALJ's RFC determination is not supported by the evidence of record" because she did not factor in Plaintiff's limitation regarding bilateral reaching and the impact that has on Plaintiff's ability to perform the VE's suggested jobs (Dkt. #10 at p. 10), this is not error. The ALJ is not required to state the RFC limitations in terms Plaintiff prefers,

---

[8] Plaintiff stated the sub-issues as follows:

> The ALJ rejected the medical opinions of the State agency medical consultants. The ALJ also rejected the medical opinion of the treating surgeon. There is no medical opinion evidence consistent with the ALJ's RFC determination, nor did the ALJ referred [*sic*] to any non-medical or other evidence which would support her RFC. Further, the ALJ failed to consider the opinion of the treating surgeon as to the Plaintiff's specific limitations, including a limitation with regard to bilateral reaching. The Plaintiff has been prejudiced thereby, as all of the jobs relied upon by the ALJ require frequent reaching.

(Dkt. #10 at pp. 1–2).

"so long as the decision shows that the ALJ considered those limitations in reaching the RFC determination." *See Brouwer v. Berryhill*, No. CV 18-2044, 2019 WL 4954606, at *7 (S.D. Tex. July 9, 2019) (citing *Bordelon v. Astrue*, 281 F. App'x. 418 (5th Cir. 2008)); *Guillory v. Saul*, No. 1:19-CV-632, 2021 WL 1600283, at *11 (E.D. Tex. Apr. 23, 2021) (internal citations omitted) (affirming where the "ALJ's decision sufficiently reflects his substantial compliance with the requirements," noting "the ALJ cited the pertinent Regulations, which demonstrate their relevance in his deliberations of [p]laintiff's subjective symptoms," "the ALJ summarized evidence relevant to the factors," and "the ALJ articulated legitimate reasons for his decision.").

Indeed, the ALJ did consider Plaintiff's limitations in her determination of Plaintiff's RFC. As the Commissioner asserts, "the ALJ is under no duty to specifically explain how persuasive she found each and every limitation contained in each opinion, and Plaintiff cites no case law requiring her to do so" (Dkt. #11 at p. 10). The court finds the ALJ's RFC reasonably incorporates Plaintiff's limitations. *See Dunson v. Berryhill*, No. 7:17-CV-00001-BP, 2018 WL 1427107, at *6 (N.D. Tex. Mar. 22, 2018) (citing *Herrera v. Comm'r*, 406 F. App'x 899, 904 (5th Cir. 2010) (per curiam)) ("The Fifth Circuit has held that an RFC assessment that reasonably incorporates a claimant's limitations is sufficient to uphold an RFC determination.").

Additionally, Plaintiff avers that the ALJ erred by assessing Plaintiff's RFC in connection with one of the VE's suggested jobs: Order Caller, DOT Code 209-667-014 (Dkt. #10 at p. 12). As Plaintiff correctly points out, the ALJ determined Plaintiff can perform sedentary work, but this job is light (Dkt. #10 at p. 12; Dkt. #10, Exhibit 1 at p. 15). This is not reversible error. Circuits are spilt on whether an ALJ may rely on a VE's testimony when it contradicts DOT provisions. *Carey v. Apfel*, 230 F.3d 131, 143–44 (5th Cir. 2000). "[T]his Court has acknowledged that the DOT job descriptions should not be given a role that is exclusive of more specific vocational expert

testimony with respect to the effect of an individual claimant's limitations on his or her ability to perform a particular job." *Id.* at 145. The court notes that Plaintiff's attorney did not raise this concern until filing this appeal (Dkt. #10). Meanwhile, Plaintiff's attorney had the ability to question the VE during the hearing. However, when asked if she would like to question the VE, Plaintiff's counsel stated: "No, ma'am, Your Honor. You asked great vocational questions [. . .,] so I don't need to" (TR 93–94). The Fifth Circuit finds, "[C]laimants should not be permitted to scan the record for implied or unexplained conflicts between the specific testimony of an expert witness and the voluminous provisions of the DOT, and then present that conflict as reversible error, when the conflict was not deemed sufficient to merit adversarial development in the administrative hearing." *Carey*, 230 F.3d at 146–47. Taking the "middle ground approach," the Fifth Circuit decided that "neither the DOT nor the vocational expert testimony is per se controlling, permit[ting] a more straightforward approach to the pertinent issue, which is whether there is substantial evidence supporting the Commissioner's determination that this particular person can do this particular job or group of jobs." *Id.* at 147. Accordingly, there is no reversible error based on the discrepancy between the VE's testimony and one of the three DOT job descriptions. Indeed, the two remaining jobs referenced by the VE are available in the national economy in the amount of at least 230,000 combined positions.

### 3. *The ALJ Did Not Substitute Her Lay Opinion for Medical Evidence*

The Social Security Administration's new rule for assessing medical opinion evidence governs all claims filed on or after March 27, 2017, including Plaintiff's here. *See* 20 C.F.R. § 404.1520c. The old rule required the ALJ to give a treating physician's opinion "controlling weight" in the absence of specific mitigating factors, and to "always give good reasons" in the determination for the weight given to a treating physician's opinion. 20 C.F.R. § 404.1527(c)(2).

The new rule eliminates the "controlling weight" given to treating physicians. 20 C.F.R. § 404.1520c(a). A medical opinion is a statement about what functional limits a claimant may have from an impairment. 20 C.F.R. § 404.1513(a)(2).

The new rule, 20 C.F.R. § 404.1520c, provides that the ALJ will not "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from the [claimant's] medical sources." 20 C.F.R. § 404.1520c(a).[9] Rather, the ALJ shall "evaluate the persuasiveness" of all medical opinions and prior administrative medical findings using the factors set forth in the regulations: (1) supportability; (2) consistency; (3) relationship with the claimant, including length of the treatment relationship, frequency of examinations, purpose of the treatment relationship, extent of the treatment relationship, and examining relationship; (4) specialization; and (5) other factors, including but not limited to evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of the agency's disability program's policies and evidentiary requirements. 20 C.F.R. § 404.1520c(a), (c)(1)–(5). However, supportability and consistency are the most important factors. *See* 20 C.F.R. §§ 404.1520(b)(2), 404.1520c(a). Supportability means the degree to which objective medical evidence supports the medical opinion at issue, and consistency looks to the consistency between different medical opinions across the

---

[9] In transitioning to the new rule, the administration noted, "[t]he current policies that focus upon weight, including the treating source rule, have resulted in reviewing courts focusing more on whether we sufficiently articulated the weight we gave opinions rather than on whether substantial evidence supports the Commissioner's final decision." *Webster v. Comm'r*, No. 3:19-cv-97-DAS, 2020 WL 760395, at *3 (N.D. Miss. Feb. 14, 2020). "In other words, the new rules are an attempt to eliminate confusion about a hierarchy of medical sources. . . . Reviewing courts, therefore, will now look first and foremost simply to whether substantial evidence exists to support an ALJ's opinion and not whether one opinion was correctly weighted in relation to any other(s)." *Id.*

record. 20 C.F.R. § 404.1520c(c)(1)–(2).[10] The new rule also changed the articulation requirements for how the ALJ considers each medical opinion. The new articulation requirements state:

> (1) Source-level articulation. Because many claims have voluminous case records containing many types of evidence from different sources, it is not administratively feasible for us to articulate in each determination or decision how we considered all of the factors for all of the medical opinions and prior administrative medical findings in your case record. Instead, when a medical source provides multiple medical opinion(s) or prior administrative medical finding(s), we will articulate how we considered the medical opinions or prior administrative medical findings from that medical source together in a single analysis using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate. We are not required to articulate how we considered each medical opinion or prior administrative medical finding from one medical source individually.

20 C.F.R. § 404.1520c(b)(1)-(2); *see Moore v. Comm'r*, No. 3:20-CV-241-SA-DAS, 2021 WL 2834395, at *2 (N.D. Miss. July 7, 2021) (finding that the medical source regulations do not "require the ALJ to expressly address the persuasiveness of every opinion within every report").

Plaintiff argues the ALJ improperly substituted her own lay opinion for that of the SAMCs by finding their opinions "to be only 'partially persuasive for the climbing and postural limitations'" and determining Plaintiff was limited "to the sedentary exertional level based upon her 'review and interpretation of the record'" (Dkt. #10 at p. 8). Plaintiff also argues that the ALJ improperly substituted her own lay opinion for that of Dr. Slabisak's by finding "his opinion to be

---

[10] "With respect to 'supportability,' 'the strength of a medical opinion increases as the relevance of the objective medical evidence and explanations presented by the medical source increase,'" and consistency is "an all-encompassing inquiry focused on how well a medical source is supported, or not supported, by the entire record." *Luckett v. Kijakazi*, No. 4:20-CV-04002, 2021 WL 5545233, at *4 (S.D. Tex. Nov. 26, 2021) (citing 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1)) (quoting *Vellone v. Saul*, No. 1:20-CV-00261-RAK-HP, 2021 WL 319354, at *6 (S.D.N.Y. Jan. 29, 2021). "Considering the newness of the regulations, there is a dearth of caselaw concerning what constitutes a sufficient 'explanation' of supportability and consistency under 20 C.F.R. § 404.1520c(b)(2)." *Liguez v. Kijakazi*, No. 4:20-CV-02798, 2021 WL 4943321, at *4 (S.D. Tex. Aug. 11, 2021), *report and recommendation adopted sub nom. Liguez v. Comm'r of Soc. Sec.*, No. 4:20-CV-2798, 2021 WL 4941997 (S.D. Tex. Oct. 22, 2021). But "this is not a case in which the ALJ found no medical opinion persuasive and crafted a completely distinctive RFC." *Id.* at *9.

'unpersuasive and not consistent with or supported by the medical evidence of record'" (Dkt. #10 at p. 9).

The Commissioner argues in response that Plaintiff even acknowledged in her brief "the ALJ discussed the SAMC opinions[11] and Dr. Slabisak's opinion, provided an analysis of the factors of supportability and consistency (including multiple references to the record (lack of consistency) and discussion of how Dr. Slabisak's limitations had no supporting evidence referenced), and explained how persuasive she found these opinions" (Dkt. #11 at p. 10). The Commissioner concludes that "the ALJ provided a detailed explanation of her consideration of the medical opinions at issue. . . . Here, the ALJ fulfilled her duty" (Dkt. #11 at p. 12). The court agrees. The ALJ applied the correct legal standard for assessing medical evidence for claims filed after March 27, 2017, by assessing the supportability and consistency of the referenced medical opinions.[12] The ALJ determines whether a claimant's severe impairments and functional limitations prevent her from working. Any statements by Dr. Slabisak as to whether Plaintiff can work is opinion evidence, which "is inherently neither valuable nor persuasive to the issue of whether [claimant is] disabled." *See* 20 C.F.R. § 404.1520b(c).

Here, the ALJ explained at length why she found Dr. Slabisak's report unpersuasive and inconsistent when formulating the RFC:

---

[11] The SAMCs indicated Plaintiff had an RFC of light exertional level (TR 106, 123). However, after reviewing a more complete record than the SAMCs had access to, the ALJ determined Plaintiff was more limited than the light exertional level:

> However, the undersigned finds justification for a conclusion that the claimant's impairments limit her to the sedentary exertional level, more than was previously determined. The undersigned bases this on review and interpretation of the record that includes additional evidence received during the development of this claim at the adjudicative level, including an EMG with lumbar and cervical radiculopathy and mild carpal tunnel syndrome (Exhibit 15F/2), in combination with giving full consideration to the claimant's testimony regarding pain and dizzy episodes, but also considering the imaging and laboratory results showed no abnormalities (see Exhibit 14F/17, 20-23).

(TR 47).
[12] Evidence is "inconsistent when it conflicts with other evidence, contains an internal conflict, is ambiguous, or when the medical evidence does not appear to be based on medically acceptable clinical or laboratory diagnostic techniques." 20 C.F.R. § 416.920b(b).

Vudhi Slabisak, M.D., completed a Residual Functional Capacity Questionnaire on February 17, 2021. Dr. Slabisak stated the claimant had been a patient for over 10 years. Dr. Slabisak saw the claimant for office visits and procedures every one to two months. Diagnoses include chronic pain syndrome, failed back syndrome, cervical degenerative disc disease, cervicalgia, and cervical radiculopathy. Dr. Slabisak noted that the claimant has chronic pain/paresthesia in the lower/mid back, neck, and bilateral arms/legs. The claimant has numbness in the hands and legs, exacerbated with any exertion. Symptoms include muscle spasm, muscle weakness, sensory changes, impaired sleep, impaired appetite, lack of coordination, abnormal posture, and reflex changes. Dr. Slabisak noted that the claimant also had severe headache pain one to two times weekly, associated with impairment of the cervical spine. Dr. Slasbisak [*sic*] states that the claimant is unable to sit, stand, or walk for extended periods due to debilitating neck and back pain, muscle spasms, and migraines. Treatment had included rhizotomy and medication with some relief. Dr. Slasbisak [*sic*] found the claimant incapable of even low stress jobs. Dr. Slasbisak [*sic*] opined that the claimant could sit, stand, and walk less than 2-hours each out of an 8-hour workday (Exhibit 13F). The undersigned agrees that the claimant has severe impairments, but there is no explanation or description given to support this opinion. The undersigned finds this opinion unpersuasive and not consistent with or supported by medical evidence of record. This opinion is inconsistent with subsequent treatment notes that document the claimant being stable with relatively normal physical exam findings. For example, post-fusion examinations, while noting pain during range of motion testing, her gait was within normal limits, motor strength bilaterally was within normal limits, and strength was 5/5 in the bilateral lower extremities (Exhibit 12F/8). In January 2020, the claimant followed up for medications. The claimant had a normal gait and stance. The claimant had no pain during lateral flexion and extension or the bilateral lower extremities. Motor examination was within normal limits. Evaluation in February 2020 noted decreased response to tactile stimulation in the bilateral lower extremities. The claimant had 5/5 strength in the bilateral lower extremities and normal gait/station. Medications included Gabapentin and Norco. The claimant had a diagnosis of failed back syndrome (Exhibits 12F/17, 20). In April 2020, the doctor adjusted the claimant's medications and reduced pain killers to once a day. A muscle relaxer was added (Exhibit 12F/26). Further, subsequent exams noted the claimant was in no acute distress, well-groomed, alert and fully oriented with intact deep tendon reflexes in the bilateral upper and lower extremities (see Exhibits 14F/10, 17; 16F/10,13,18). In this regard, Dr. Slabisak's assessment has been found unpersuasive.

Based on the foregoing, the undersigned finds the claimant has the above residual functional capacity assessment, which is supported by the medical record, the claimant's activities, and the findings by the state agency medical and psychological consultants.

(TR 46–47). Ultimately, the ALJ determined the objective medical evidence does not support the severity of limitations in Dr. Slabisak's opinion evidence, and treating physicians are not afforded controlling weight under the new rule.[13]

Plaintiff asserts "the ALJ rejected every medical opinion in this record" (Dkt. #10 at p. 9). This is simply incorrect. Rather, the ALJ did not give complete deference to any single medical source or opinion. Regardless, there is no requirement that the ALJ adopt any single medical opinion in its entirety. And there has never been a requirement in the Fifth Circuit that an RFC precisely match an expert medical opinion. *Dixon v. Comm'r*, No. 4:18-CV-634, 2019 WL 5875901, at *1 (E.D. Tex. Sept. 27, 2019). The ALJ may assess all the evidence in the record and "is not confined to picking one opinion and adopting it." *D.J.M. v. Berryhill*, No. 18-cv-0193, 2019 WL 1601491, at *4 (W.D. La. 2019) ("Like a trial judge or jury, the ALJ may weigh the competing opinions, take into consideration all of the other evidence of record, and make a finding that may not be exactly the same as the opinion of any one medical source."). The ALJ's review of the evidence demonstrates substantial compliance with the applicable regulations, and Plaintiff has not shown that the ALJ erred by doing so. *See Liguez v. Kijakazi*, No. 4:20-CV-02798, 2021 WL 4943321, at *9 (S.D. Tex. Aug. 11, 2021), *report and recommendation adopted sub nom. Liguez v. Comm'r*, No. 4:20-CV-2798, 2021 WL 4941997 (S.D. Tex. Oct. 22, 2021) ("The ALJ discussed the medical opinion(s) and prior administrative medical finding(s) in accordance with the requirements of 20 CFR 416.920c.").

---

[13] "The Fifth Circuit has recognized that opinions of treating physicians are not entitled to considerable weight when they are brief and conclusory and lack explanatory notes or supporting objective tests and examinations. *Stephens v. Saul*, No. 3:20-CV-823-BH, 2020 WL 7122860, at *7 (N.D. Tex. Dec. 4, 2020) (citing *Heck v. Colvin*, 674 F. App'x 411, 415 (5th Cir. 2017); *Foster v. Astrue*, 410 F. App'x 831, 833 (5th Cir. 2011)). Here, the Residual Functional Capacity Questionnaire by Dr. Slabisak contains no information as to why the objective evidence would support the severity of the limitations urged by Plaintiff (TR 477–81).

Even so, there is medical evidence supporting the RFC. In fact, the ALJ crafted an RFC *more* limited than the SAMCs. Plaintiff attempts to paint this as an example of the ALJ substituting her judgment for that of the SAMCs (Dkt. #10 at p. 9), but the ALJ cites objective medical evidence for the additional limitations, including "additional evidence received during the development of this claim at the adjudicative level, including EMG with lumbar and cervical radiculopathy and mild carpal tunnel syndrome . . . giving full consideration to the claimant's testimony . . . , but also considering the imaging and laboratory results showed no abnormalities" (TR 46).

The ALJ does not err by fashioning an RFC based on the record as a whole. *See Fleming v. Saul*, No. SA-19-CV-00701-ESC, 2020 WL 4601669, at *7 (W.D. Tex. Aug. 10, 2020) (citing *Taylor*, 706 F.3d at 602-03) ("Although the ALJ did not adopt in its entirety any one medical opinion of record in fashioning his RFC, he also did not completely reject every opinion either. Instead, the ALJ properly evaluated all of the medical opinions in the record (none of which arose out of a treatment relationship) in accordance with the Section 404.1520c's more flexible methodology for analyzing opinion evidence and exercised his discretion to resolve conflicts in the evidence to assess the RFC based on all the relevant evidence in the record."). Therefore, the ALJ properly weighed the medical and non-medical evidence in determining Plaintiff's RFC, committing no reversible error.

## CONCLUSIONS AND RECOMMENDATION

For the foregoing reasons, the court recommends the Commissioner's decision be **AFFIRMED**.

Within fourteen (14) days after service of the magistrate judge's report, any party must serve and file specific written objections to the findings and recommendations of the magistrate

judge. 28 U.S.C. § 636(b)(1)(C). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's report and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific.

Failure to file specific, written objections will bar the party from appealing the unobjected-to factual findings and legal conclusions of the magistrate judge that are accepted by the district court, except upon grounds of plain error, provided that the party has been served with notice that such consequences will result from a failure to object. *See Douglass v. United Services Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996) (en banc), *superseded by statute on other grounds*, 28 U.S.C. § 636(b)(1) (extending the time to file objections from ten to fourteen days).

**SIGNED this 13th day of September, 2023.**

AILEEN GOLDMAN DURRETT
UNITED STATES MAGISTRATE JUDGE